# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

GREAT WEST CASUALTY COMPANY,

       Plaintiff,

v.

GENERAL CASUALTY COMPANY OF
WISCONSIN; HOLICKY BROS., INC.;
NATHAN PETERSON; and ANN HILL
PETERSON,

       Defendants.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 09-555 (MJD/SRN)

_____

Andrea E. Resibord and Michael W. McNee, Cousineau McGuire Chartered,
Counsel for Plaintiff Great West Casualty Company.

Timothy P. Tobin and Lynn Schmidt Walters, Gislason & Hunter LLP, Counsel
for Defendant General Casualty Company of Wisconsin.

John M. Riedy, Maschka Riedy & Ries, PLLP, Counsel for Defendant Holicky
Bros., Inc.

No appearance by Nathan Peterson.

Andrew L. Davick, Meshbesher & Spence, Ltd., Counsel for Defendant Ann Hill
Peterson.

_____

1

## I. INTRODUCTION

This matter is before the Court on Plaintiff Great West Casualty Company's Motion for Summary Judgement [Docket No. 26] and Defendant General Casualty Company of Wisconsin's Motion for Summary Judgment [Docket No. 33]. The Court heard oral argument on July 9, 2010.

## II. BACKGROUND

This case involves an insurance coverage dispute related to a 2005 vehicle accident.

### A. The Accident

On June 30, 2005, Defendant Nathan Peterson was driving a 1997 Freightliner semi-tractor, which he owned, and was hauling freight in an attached 1998 East dump trailer owned by Defendant Holicky Bros., Inc. ("Holicky"). (Stip. ¶¶ 3-4.) On that day, Nathan Peterson was involved in a single-vehicle roll-over accident in Carlton County, Minnesota (the "Accident"). (Id. ¶ 3.) His passenger, Defendant Ann Hill Peterson, was injured and her left hand was amputated. (Id. ¶ 5.)

### B. The Independent Contractor Agreement

Before the Accident, Nathan Peterson and Holicky had entered into an

Independent Contractor Agreement, effective April 22, 2005. (Stip. ¶ 1; Stip., Ex. A.) Under the Independent Contractor Agreement, Nathan Peterson agreed to provide a truck "of sufficient size and capacity" to haul Holicky's trailers, as directed by Holicky. (Stip., Ex. A ¶ 1.) Additionally, Nathan Peterson agreed to be responsible for payment of casualty and liability insurance covering the truck that he used to pull Holicky's trailer, with minimum liability limits of $1 million. (Id.)

The Independent Contractor Agreement provided that Nathan Peterson agreed to hold Holicky "harmless and free and clear in connection with any and all liability in connection with the operation of [Nathan Peterson's] truck and pulling of [Holicky's] trailers during the term of this Contract and shall indemnify [Holicky] for any loss occasioned thereby including reasonable attorneys fees and costs." (Id.) The parties agree that the Accident occurred while Nathan Peterson was transporting freight in interstate commerce pursuant to the Independent Contractor Agreement. (Stip. ¶ 3.)

C.     **Progressive Policy**

At the time Nathan Peterson entered into the Independent Contractor Agreement, he was insured under a Commercial Auto Policy issued by

3

Progressive Classic Insurance Company ("Progressive Policy"). (Stip. ¶ 6; Stip., Ex. 2.) The Progressive Policy requires Progressive to "pay damages . . . for which an insured is legally liable because of an accident." (Stip., Ex. 2 at 13 of 33.) It has a liability limit of $1 million. (Id. at 1 of 33.)

The Progressive Policy defines the "insured" to mean the named insured – Nathan Peterson – and, among others, "any other person or organization, but only with respect to the legal liability of that person or organization for the acts or omissions of any person otherwise covered under [the liability provisions of the policy] while driving your insured auto." (Stip., Ex. 2 at 13 of 33.)

The term "your insured auto" is defined to include, among other things, "[a]ny auto described in the Declarations." (Id. at 10 of 33.) It further is defined to include trailers, even if not listed in the declarations, "but only while upon a public road and connected to your insured auto." (Id. at 11 of 33.) The 1997 Freightliner tractor is specifically listed in the policy declarations, as are all non-owned attached trailers. (Stip., Ex. 2 at 3 of 33.) Nathan Peterson's 1997 Freightliner tractor is listed as the only scheduled vehicle, and a liability premium of $3,497.00 was charged for the Freightliner. (Id.) The Progressive Policy charged an additional liability premium of $798.00 for non-owned

4

attached trailer liability coverage.  (Id.)  In total, including other coverage, such as uninsured/underinsured motorist ("UM/UIM") coverage, and a $25 fee, the premium for the policy was $5,554.  (Id. at 1 of 33.)

Nathan Peterson obtained an endorsement naming Holicky as an additional insured, effective April 29, 2005.  (Form No. 1198 (8-93), Stip., Ex. 2 at 2, 4 of 33.)  The endorsement provides that the insurance applies only to the extent that Holicky is liable for the conduct of another insured.  (Id.)  The endorsement further provides: "We also agree with you that insurance provided by this agreement will be excess insurance over any other valid and collectible insurance."  (Id.)

On the other hand, the Progressive Policy's "other insurance" provision provides that "[t]his coverage is primary when your insured auto which is a trailer is attached to an insured auto you [Nathan Peterson] own."  (Stip., Ex. 2 at 17 of 33.)  It further provides that, if there is other applicable liability insurance for a covered accident, Progressive will pay the proportionate share that its limit of liability bears to the total of all applicable liability limits.  (Id.)

> ### D. General Casualty Policies
>
> #### 1. General Casualty Commercial Automobile Policy

At the time of the Accident, Holicky was insured under a Commercial Auto Policy issued by Defendant General Casualty Company of Wisconsin ("General Casualty") ("General Casualty Auto Policy"). (Stip. ¶ 8; Stip., Ex. 3.) The policy provides a schedule of covered vehicles owned by Holicky and insured under the General Casualty Auto Policy, which lists multiple tractors and trailers, including the 1998 East end dump trailer Nathan Peterson was hauling at the time of the Accident. (Stip. ¶ 10; Declarations and End. No. 001, Stip., Ex. 3 at 3, 6 of 53.)

The General Casualty Auto Policy requires General Casualty to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" (Stip., Ex. 3 at 14 of 53.) With regard to liability coverage, the phrase "Covered Autos" is defined by symbol "01." (Id. at 2 of 53.) The Business Auto Coverage Form states that "01" corresponds to "Any 'Auto.'" (Id. at 13 of 53.) "'Auto' means a land motor vehicle, 'trailer' or semitrailer designed for travel on public roads, but does not include' mobile equipment.'" (Id. at 21 of 53.)

The General Casualty Auto Policy includes statutorily required liability,

personal injury protection ("PIP") and UM/UIM coverages.  (Declarations, Stip.,
Ex. 3 at 31-42 of 53.)  The policy includes a liability limit of $1 million.  (<u>Id.</u> at 2
and 6 of 53.)  Holicky paid $3,941.00 in liability premiums for the General
Casualty policy.  (<u>Id.</u> at 2 of 53.)  Overall, including premiums for PIP, UM/UIM,
physical damage, etc., it paid $7,810.00 in premiums.  (<u>Id.</u>)

The General Casualty Auto Policy "other insurance" clause states that it
"provides primary insurance" for "any covered 'auto' you own."  (<u>Id.</u> at 20 of 53.)
It also states:

> [W]hile a covered "auto" which is a "trailer" is connected to another
> vehicle, the Liability Coverage this Coverage Form provides for the
> "trailer" is
>
> (1)    Excess while it is connected to a motor vehicle you do not
>        own.
>
> (2)    Primary while it is connected to a covered "auto" you own.

(<u>Id.</u>)

The "other insurance" section further provides:

> When this Coverage Form and any other Coverage Form or policy
> covers on the same basis, either excess or primary, we will pay only
> our share.  Our share is the proportion that the Limit of Insurance of
> our Coverage Form bears to the total of the limits of all the Coverage
> Forms and policies covering on the same basis.

7

(Id. at 21 of 53.)

## 2. General Casualty Commercial Umbrella Liability Policy

Effective during the time of the Accident, Holicky also purchased a

Commercial Umbrella Policy from General Casualty ("General Casualty

Umbrella Policy"), which provided an additional $1 million in liability coverage.

(Stip. ¶ 11; Stip., Ex. 4 at 4 of 36.)  Holicky paid a premium of $1,500 for the

umbrella policy.  (Stip., Ex. 4 at 4 of 36.)

## E. Great West Policy

### 1. Explanation of a Filings Only Policy

Holicky also purchased a policy from Defendant Great West Casualty

Company ("Great West"), effective March 11, 2005, the same effective date as the

General Casualty Auto Policy and General Casualty Umbrella Policy, through

March 11, 2006.  (Stip. ¶ 12; Stip., Ex. 5; Gilreath Aff. ¶ 2.)  Great West

characterizes this policy as a "filings only" policy and this designation appears

throughout the policy. (See, e.g., Policy, Stip., Ex. 5 at 9 of 52 (listing, under

"Special Provisions:" "Motor Carrier – Filings Only"); Gilreath Aff. ¶ 4.)

According to Great West, filings only policies are issued for motor carriers,

such as Holicky, to comply with the United States Department of Transportation

("DOT") proof of minimum financial security requirements, so that the insured can maintain operating authority. (Gilreath Aff. ¶4.) Filings only policies are intended to act as sureties and are to be used as a last resort when no other coverage is available, for the protection of the public. (Id. ¶ 5.)

Great West avers that the intent of the policy is only to ensure the availability of a minimum level of protection for the public rather than to provide true insurance coverage, as demonstrated by the terms of the policy; the lack of a premium; the lack of no-fault and UM/UIM coverage, which is required by state law; the inclusion of an endorsement requiring Holicky to reimburse Great West for any claims paid; and the absence of any underwriting. (Gilreath Aff. ¶¶ 5-9; Gilreath Aff., Ex. A.)

Holicky's application to Great West was made by MacKenzie Agency, the same agency that procured the General Casualty policies for Holicky. (Gilreath Aff., Ex. A.) The application requests a "filings only" policy and provides minimal information regarding Holicky such as its name, address, telephone number, DOT number, and its permit numbers for the two additional states (Minnesota and Iowa) in which filings were to be made on its behalf. (Gilreath Aff. ¶ 6; Gilreath Aff., Ex. A.) Throughout the application, when additional

information is requested, such as information regarding vehicles to be covered, drivers, revenue, mileage driven, number of power units, commodities transported, or past losses, the application states "Filings Only."  (Gilreath Aff., Ex. A.)

### 2.    Policy Language

Holicky paid $250.00 for the liability portion of the Great West Policy. (Gilreath Aff. ¶ 7.)  Great West characterizes this amount as an administrative fee, not a premium.  (Id.)  The coverage is listed as having a liability limit of $1 million.  (Stip., Ex. 5 at 6 of 52.)  The Policy Declarations list no scheduled autos and indicate a premium of zero dollars.  (Id. at 5 of 52.)  The policy lists no statutorily required PIP or UM/UIM coverage.  (Id. at 6 of 52; Gilreath Aff. ¶ 8.)

The Great West Policy includes a Minnesota Truckers Coverage Form, liability section, which states that Great West is required to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" (Stip., Ex. 5 at 26 of 52.)  Holicky was a named insured "for any covered 'auto.'"  (Id.)  An "insured" also includes "[a]nyone else while using with your permission a covered 'auto'

you own, hire or borrow."  (Id.)

The Great West Minnesota Truckers Coverage Form provides that

"covered 'autos'" are only those designated by "[t]he symbols entered next to a

coverage on the Declarations."  (Stip., Ex. 5 at 24 of 52.)  The Minnesota Truckers

Coverage Form further defines "55" by directing the reader to the Declarations.

(Id. at 25 of 52.)  The Declarations state that, as to liability, "covered autos" are

"55."  (Id. at 6 of 52.)  In turn, the Declarations define "55" as follows:

> 55      **SEE ENDORSEMENT GU 40 05 07 03**
> **MOTOR CARRIER - FILINGS ONLY**

(Stip., Ex. 5, Declarations at 7 of 52.)  The Motor Carrier Filings Only

Endorsement states:

> You and any other insured must not have any Motor Carrier
> Operations under authority granted to you by a State or Federal
> entity for which we have made a Filing shown in the SCHEDULE on
> this endorsement as proof of financial responsibility.  If a "loss" or
> accident happens for which we are liable under a filing we made for
> you, then you agree to hold us harmless for any "loss" or accident
> and reimburse us for any claim, expense, "suit" or "loss" that we
> may have to pay.

(Id., Form GU 40 05 07 03, at 12 of 52.)

The endorsement further states that Great West has made filings for

Holicky in the District of Columbia, Iowa, and Minnesota.  (Id. at 11-12 of 52.)

Dean Holicky, on behalf of Holicky Bros., signed and returned the

endorsement to Great West. (Gilreath Aff. ¶ 9; Stip., Ex. 5 at 13 of 52.)

### 3. Federal Filing

Great West filed Form BMC 91X Motor Carrier Automobile Bodily Injury

and Property Damage Liability Certificate of Insurance with the Federal

Highway Administration certifying that it issued insurance to Holicky under the

terms described on the back of the form, effective March 11, 2005, and continuing

until cancelled as provided by federal statute. (Gilreath Aff., Ex. B.) The front of

the form states, "This insurance is primary and the company shall not be liable

for amounts in excess of $750,000.00 for each accident." (Id.)

The back of Form BMC 91X states:

> The receipt of this certificate by the Commission certifies that a
> policy or policies of Public Liability (or Automobile Bodily Injury
> and Property Damage Liability) insurance has been issued by the
> company identified on the face of this form, that the company is
> qualified to make this filing under Section 1043.8 or Section 1084.6 of
> Title 49 of the Code of Federal Regulations, and that by the
> attachment of . . . an endorsement prescribed by the U.S. Department
> of Transportation (its MCS 90 or a form of similar import), is
> amended to provide the coverage or security for the protection of the
> public required under Section 1043.2 of Title 49 of the Code of
> Federal Regulations. The amendment governs the operation,
> maintenance or use of motor vehicles under . . . permit issued to the
> insured . . . regardless of whether such motor vehicles are

specifically described in the policy or policies or not.

(Id.)

### 4.    Other Insurance

The Great West Policy "other insurance" clause states:

> This Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by you and used exclusively in your business as a "trucker" and pursuant to operating rights granted to you by a public authority.  This Coverage Form's Liability Coverage is excess over any other collectible insurance or self-insurance for any covered "auto" while hired or borrowed from you by another "trucker."  However, while a covered "auto" which is a "trailer" is connected to a power unit, this Coverage Form's Liability Coverage is
>
> (1)    On the same basis, primary or excess, as for the power unit if the power unit is a covered "auto."
>
> (2)    Excess if the power unit is not a covered "auto."

(Stip., Ex. 5 at 35 of 52.)  It further states, except as provided above, "this

Coverage Form provides primary insurance for any covered 'auto' you own and

excess insurance for any covered 'auto' you do not own."  (Id.)  The final

paragraph of the "other insurance" section states:

> When this Coverage Form and any other Coverage Form, policy or self insurance covers on the same basis, either excess or primary, we will pay only our share.  Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all

13

the Coverage Forms, policies, and self-insurance covering on the same basis.

(Id. at 36 of 52.)

## F.    Settlement Agreement

On January 25, 2007, Ann Hill Peterson entered into a Settlement

Agreement and Partial Release with "Nathan Peterson d/b/a Holicky Brothers,

Inc." and Progressive Classic Insurance Company ("Settlement Agreement").

(Stip. ¶ 15; Stip., Ex. 6.)  Under the Settlement Agreement, Progressive paid

$961,103.53 to Ann Hill Peterson in an agreement "governed and construed in

accordance with the principles and rules established in the case of Drake v.

Ryan."[1]  (Id. at 1.)  This settlement exhausted Progressive's policy limit of $1

million and discharged it in satisfaction of future judgments.  (Id.)  Ann Hill

Peterson reserved claims against Nathan Peterson and Holicky to the extent that

additional insurance coverage was available.  However, the agreement released

_____

[1]"A Drake v. Ryan settlement agreement arises out of the Minnesota Supreme Court's decision in Drake v. Ryan, holding that a plaintiff may 'fully release[ ] [a] defendant and his primary liability insurer up to the limits of the primary liability coverage but expressly retain[ ] the right to pursue [his or her] claims against the defendant for additional damages up to the limits of the defendant's excess liability coverage.'" Stan Koch & Sons Trucking, Inc. v. Great West Cas. Co., 517 F.3d 1032, 1037 n.5 (8th Cir. 2008) (citing Drake v. Ryan, 514 N.W.2d 785, 790 (Minn. 1994).

Nathan Peterson and Holicky Brothers from any "personal liability in excess of all available insurance limits." (Id.)

In 2009, Ann Hill Peterson sued Nathan Peterson and Holicky in Minnesota State Court, Carlton County, for the injuries sustained in the Accident. (Stip. ¶ 17; Stip., Ex. 7.) She alleges that Nathan Peterson was negligent in the operation of his vehicle and that Holicky Brothers is vicariously liable for such negligence. (Stip., Ex. 7.)

### G.    Procedural History

On March 10, 2009, Great West filed a Complaint against General Casualty, Holicky, Nathan Peterson, and Ann Hill Peterson in this Court. The Complaint seeks declaratory judgment regarding Great West's and General Casualty's legal obligations under their policies issues to Holicky. Specifically, Great West seeks a declaration that

> it does not owe coverage to Nathan Peterson for the injuries
> sustained by Ann Hill Peterson in the June 30, 2005 accident; and,
> further, that with respect to Holicky Bros., Inc., that Great West's
> policy applies on a tertiary basis after exhaustion of the limits of the
> policies of insurance issued by Progressive and Defendant General
> Casualty Company of Wisconsin.

(Compl. ¶ 25.)

Great West further seeks a declaration

> that under the terms of the <u>Drake v. Ryan</u> Settlement Agreement,
> Defendant Ann Hill Peterson has agreed that Defendants Nathan
> Peterson and Holicky Bros., Inc. are relieved of personal liability for
> her personal injuries sustained in the June 30, 2005 motor vehicle
> accident, and has further agreed to indemnify Nathan Peterson and
> Holicky for any such personal liability, thus creating a circular
> indemnity precluding any claims for coverage under Great West
> Casualty Company's filings only policy.

(Compl. ¶ 26.)

General Casualty has asserted a counterclaim against Great West and a

crossclaim against Holicky, Nathan Peterson, and Ann Hill Peterson seeking a

declaration that the General Casualty policies are tertiary to the Progressive

Policy and the Great West Policy.

Holicky has asserted a crossclaim against General Casualty and a

counterclaim against Great West seeking a declaration determining the respective

obligations of General Casualty and Great West regarding their duties to defend

and indemnify and with regard to priority of coverage.  Holicky also seeks a

declaration regarding the legal effect of the Settlement Agreement.  Holicky

further asserts a crossclaim against Nathan Peterson and Ann Hill Peterson

seeking a declaration that Holicky is entitled to indemnity from Nathan Peterson

and that Holicky has no liability to Ann Hill Peterson.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.  Legal Standard for Interpretation of Insurance Policies

#### 1.  General Rules of Insurance Contract Interpretation

The interpretation of the language of an insurance contract is usually a legal question for the court to decide.  Murray v. Greenwich Ins. Co., 533 F.3d 644, 648 (8th Cir. 2008); Jenoff, Inc. v. N.H. Ins. Co., 558 N.W.2d 260, 262 (Minn. 1997).  In this diversity case, generally, the interpretation of Minnesota-issued insurance policies is a matter of Minnesota law.  See Murray, 533 F.3d at 648.

Under Minnesota law, "[w]hen insurance policy language is clear and unambiguous, 'the language used must be given its usual and accepted meaning.'" Wanzek Constr., Inc. v. Employers Ins. of Wausau, 679 N.W.2d 322, 324 (Minn. 2004) (citation omitted).

However, if the policy language is ambiguous, the ambiguity must be resolved in favor of the insured by "interpreting the ambiguity in accordance with the reasonable expectations of the insured." Westchester Fire Ins. Co. v. Wallerich, 563 F.3d 707, 712 (8th Cir. 2009) (quoting SECURA Supreme Ins. Co. v. M.S.M., 755 N.W.2d 320, 323 (Minn. Ct. App. 2008)).

> In deciding whether an ambiguity truly exists, however, a policy must be read as a whole. The language must be considered within its context, and with common sense. If a phrase is subject to two interpretations, one reasonable and the other unreasonable in the context of the policy, the reasonable construction will control and no ambiguity exists.

Mutual Serv. Cas. Ins. Co. v. Wilson Twp., 603 N.W.2d 151, 153 (Minn. Ct. App. 1999) (citations omitted). "Construction of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all of its provisions and is consistent with the general intent." West Bend Mut. Ins. Co. v. Armstrong, 419 N.W.2d 848,

850 (Minn. Ct. App. 1988) (citation omitted). "When provisions of a policy

conflict with an endorsement or rider, the provisions of the endorsement

govern." Steele v. Great W. Cas. Co., 540 N.W.2d 886, 888 (Minn. Ct. App. 1995).

 Reasonable doubts as to the meaning of the language of the policy should be

construed against the insurer, but courts may not read ambiguity into the plain

language of the policy in order to construe it against the insurer. State Farm Ins.

Cos. v. Seefeld, 481 N.W.2d 62, 64 (Minn. 1992).

### 2.    Applicability of Federal Law

In this case, while Minnesota law governs the general interpretation of the

policies at issue, federal law governs the interpretation of the legal effect of Great

West's federal filings. Because Holicky is a motor carrier that transports property

in interstate commerce, it is subject to federal regulations requiring it to obtain

and maintain minimum levels of insurance or surety coverage and to furnish

proof of such coverage in order to maintain operating authority. 49 C.F.R.

§§ 387.7, 387.301(a). Great West filed a Motor Carrier Automobile Bodily Injury

and Property Damage Liability Certificate of Insurance with the Federal

Highway Administration, certifying the issuance of its policy subject to limits of

$750,000. Although not physically attached to the policy, as shown by the

submitted exhibits, Great West concedes that federal law requires that, based on the Form BMC 91X filing, another endorsement, the MCS-90 endorsement, is deemed to be read into the Great West Policy. See, e.g., Prestige Cas. Co. v. Mich. Mut. Ins. Co., 99 F.3d 1340, 1348 n.6 (6th Cir. 1996).

Because the filing and endorsement are required by federal law, federal law governs the operation and effect of the insurance filings and related insurance policy endorsements. See, e.g., Planet Ins. Co. v. Transp. Indem., 823 F.2d 285, 288 (9th Cir. 1987) ("We rely on the federal statutory and regulatory scheme to decide the issue of authorized carrier responsibility. The special interstate character of the authorized carrier insurance industry underscores the need to refer to the federal scheme to determine when mandatory coverage comes into effect.") (citations omitted); Am. Alternative Ins. Co. v. Sentry Select Ins. Co., 176 F. Supp. 2d 550, 554 (E.D. Va. 2001) (holding that, while state law typically governs a diversity insurance coverage dispute, "as well-reasoned cases reflect, federal law must govern where, as here, the dispute concerns the interpretation of an insurance policy endorsement that is required by federal law and whose language is prescribed by a federal regulation" and reasoning that "indeed, were this not so, the anomalous result would be the prospect of

conflicting state constructions of a federal statute that was enacted by Congress

to serve as a uniform solution to a national problem affecting interstate

commerce") (footnote omitted).  See also W. Air Lines, Inc. v. Bd. of Equalization

of State of S.D., 480 U.S. 123, 129(1987) (noting "absent a clear indication to the

contrary, the meaning of words in a federal statute is a question of federal law").

### C.  Coverage by the non-Great West Policies

#### 1.  General Casualty Auto Policy

General Casualty states that, for the purposes of its motion, it will assume

that the General Casualty Auto Policy provides liability coverage for the accident.

([Docket No. 35] at 17.)  Regardless of General Casualty's admission, it is clear

that, based on the policy language and the stipulated facts, the General Casualty

Auto Policy does apply.

#### 2.  General Casualty Umbrella Policy

The General Casualty Umbrella Policy is excess, as it states, "If other valid

and collectible insurance is available to the insured for a loss we cover under this

Coverage part . . . .  This insurance is excess over any of the other insurance,

expect for other insurance bought specifically to apply in excess of the Limits of

Insurance shown in the Declarations of this Coverage Part."  (Stip., Ex. 4 at 18 of

36.)  There are three other insurance policies at issue, each with a $1 million limit.

The parties agree that, given Ann Hill Peterson's injuries, no matter how the

Court rules on priority of coverage, the Court will not need to reach the General

Casualty Umbrella Policy.

### 3.  Progressive Policy

The parties agree that the Progressive Policy applies.  As noted previously,

Nathan Peterson and Holicky are both named as insureds under the Progressive

Policy, and the policy obligates Progressive to "pay damages . . . for which an

insured is legally liable because of an accident."  Also, the policy defines

"insured" to mean anyone driving "your insured auto," and "your insured auto"

is defined to include the tractor being driven by Nathan Peterson at the time of

the Accident.

### D.  Whether the Great West Policy Provides Coverage for the Accident

### 1.  Whether the Great West Policy Provides Coverage Based on the Policy Language

An insurance policy, its endorsements, and its declarations must be read

together in order to determine the scope of coverage.  <u>Steele</u>, 540 N.W.2d at 888.

"It is well established that the declarations pages of an insurance policy are a

crucial part of the policy, and interpretation of the declarations is important to determine the scope of the policy." Reinsurance Ass'n of Minn. v. Johannessen, 516 N.W.2d 562, 564 (Minn. Ct. App. 1994)) (citation omitted).

The Great West Policy, by its terms, only provides coverage for damages resulting from the ownership, maintenance or use of a "covered 'auto.'" The Minnesota Truckers Coverage Form, in "SECTION I - COVERED AUTOS," defines what types of autos are "covered autos" for each of the coverages actually purchased by the insured by referring back to the policy Declarations:

> Item Two of the Declarations shows the 'autos' that are covered 'autos' for each of the coverages. The following numerical symbols describe the 'autos' that may be covered 'autos.' The symbols entered next to a coverage on the Declarations designate the only 'autos' that are covered 'autos.'

(Great West Policy at 24 of 52.) The Declarations state that, as to liability, "covered autos" are "55." (Id. at 6 of 52.) The Minnesota Truckers Coverage Form further explains that, for the symbol "55," "[s]ee the Declarations for the description of this symbol." (Id. at 25 of 52.) The Declarations state:

> **SEE ENDORSEMENT GU 40 05 07 03**
> **MOTOR CARRIER - FILINGS ONLY**

(Id. at 7 of 52.)

The types of autos that could have been, but were not, designated in the Declarations as covered autos include commercial autos, including trailers, owned by Holicky (symbol 43), autos leased by Holicky (symbols 51, 52), autos specifically listed and described in the Policy Declarations (symbol 46), or, as in the General Casualty Auto Policy, "any auto" (symbol 41).

The Motor Carrier Filings Only endorsement to the policy does not confer any additional coverage. Instead, the Motor Carrier Filings Only endorsement is exclusionary:

> You [Holicky] and any other insured must not have any Motor Carrier operations under authority granted to you by a State or Federal entity for which we have made a Filing shown in the SCHEDULE on this endorsement as proof of financial responsibility.

(Great West Policy at 11-13 of 52.) This provision provides that covered autos cannot include any vehicle being operated under federal authority in interstate commerce, or under authority granted by the states of Minnesota and Iowa, the state and federal entities for which Great West made filings on behalf of Holicky Brothers. Holicky's operations in both Minnesota and Iowa, where the trip culminating in the Accident began, are, therefore, excluded. This endorsement eliminates coverage by 1) stating that Holicky must not have any motor carrier

operations in a state in which Great West made a filing for Holicky; and 2)

providing that Holicky will reimburse Great West for any loss it is liable for

based on the filing. Requiring the insured to reimburse the insurer for a covered

loss would defeat the purpose of traditional insurance; however, it would fulfill

the purpose of the federal motor carrier insurance requirement to protect the

public. Holicky signed this specific endorsement. The plain language of the

Great West Policy does not confer coverage for the Accident.

**2.      Purpose and Effect of Great West's DOT Filing and the
MCS-90 Endorsement**

**i.      Statutory and Regulatory Background**

Much of the parties' argument revolves around the effect, if any, of Great

West's federal filings and federal MCS-90 endorsement. "The operation and

effect of the MCS-90 endorsement is a matter of federal law." <u>Canal Ins. Co. v.

Distrib. Servs., Inc.</u>, 320 F.3d 488, 492 (4th Cir. 2003) (citations omitted).

In order to engage in the interstate transportation of property, a motor

carrier must maintain insurance or other financial security with the minimum

limits of coverage prescribed by the DOT: "No motor carrier shall operate a

motor vehicle until the motor carrier has obtained and has in effect the minimum

levels of financial responsibility as set forth in § 387.9 subpart."  49 C.F.R.

§ 387.7(a).  <u>See also</u> 49 U.S.C. § 13906(a)(1) (providing that motor carriers must

file "with the Secretary a bond, insurance policy, or other type of security

approved by the Secretary" to pay for injury, death, or property damage

resulting from the negligent use of a motor vehicle).  The minimum level of

financial responsibility required for the transportation of non-hazardous

commodities is $750,000.  49 U.S.C. § 31139(b)(2); 49 C.F.R. § 387.9.

Under the Federal Motor Carrier Safety Regulation, a motor carrier may

demonstrate proof of financial responsibility in one of three manners:

> (1) "Endorsement(s) for Motor Carrier Policies of Insurance for
> Public Liability Under Sections 29 and 30 of the Motor Carrier
> Act of 1980" (Form MCS–90) issued by an insurer(s);

> (2) A "Motor Carrier Surety Bond for Public Liability Under
> Section 30 of the Motor Carrier Act of 1980" (Form MCS–82)
> issued by a surety; or

> (3) A written decision, order, or authorization of the Federal
> Motor Carrier Safety Administration authorizing a motor
> carrier to self-insure under § 387.309, provided the motor
> carrier maintains a satisfactory safety rating as determined by
> the Federal Motor Carrier Safety Administration under part
> 385 of this chapter.

49 C.F.R. § 387.7(d).  <u>See also</u> 49 U.S.C. § 31139(f)(1).  Therefore, a motor carrier

can meet its financial responsibility requirements through insurance, a surety

bond, or authorized self-insurance.  Additionally, 49 U.S.C. § 31139(f)(1)(B)

permits a fourth method of proof – a guarantee, if that is acceptable to the

Secretary of Transportation.

A motor carrier must also file proof that it has met the financial

responsibility requirements in order to maintain its operating authority:

> No common or contract carrier . . . shall engage in interstate or
> foreign commerce, and no certificate or permit shall be issued to
> such a carrier or remain in force unless and until there shall have
> been filed with and accepted by the FMCSA surety bonds,
> certificates of insurance, proof of qualifications as self-insurer, or
> other securities or agreements, in the amounts prescribed in
> § 387.303, conditioned to pay any final judgment recovered against
> such motor carrier for bodily injuries to or the death of any person
> resulting from the negligent operation, maintenance or use of motor
> vehicles in transportation subject to Subtitle IV, part B, chapter 135 of
> Title 49 of the United States Code, or for loss of or damage to
> property of others . . . .

49 C.F.R. § 387.301(a)(1).

When a motor carrier meets its financial responsibility obligations by

obtaining insurance, it must file a Form BMC 91X Certificate of Liability

Insurance with the Federal Highway Administration and use an MCS-90

endorsement with the certified policy.  See 49 U.S.C. § 13906(f); 49 C.F.R.

§§ 387.7(d)(1), 387.15, 387.313(a)(3), (4). <u>See also</u> <u>Distrib. Servs., Inc.,</u> 320 F.3d at 489. The MCS-90 endorsement is usually attached to the policy certified to the Department of Transportation; however, even if it is not, the endorsement is read into and deemed a part of the policy as a matter of law. <u>See, e.g.,</u> <u>Prestige Cas. Co.,</u> 99 F.3d at 1348 n.6.

### ii. Purpose: Protection of the Public

The main purpose of the MCS-90 endorsement and the underlying financial responsibility regulations is to ensure that the public is adequately protected from the risks created by a motor carrier's operations and to ensure the collectibility of a judgment against the motor carrier. <u>See, e.g.,</u> <u>Carolina Cas. Ins. Co. v. Yeates</u>, 584 F.3d 868, 875 (10th Cir. 2009) (en banc) ("[T]he financial responsibility provisions require motor carriers to demonstrate they are adequately insured in order to protect the public from risks created by the carriers' operations."); <u>Canal Ins. Co. v. Kwik Kargo, Inc. Trucking</u>, Civil No. 08-439(JNE/RLE), 2009 WL 1086524, at *2 (D. Minn. Apr. 21, 2009) ("The MCS-90 originated from the desire of the ICC that the public be adequately protected when a licensed carrier uses a leased vehicle to transport goods pursuant to an ICC certificate.") (footnote and citation omitted).

28

In order to achieve this goal of protecting the public, "the MCS-90 endorsement creates a suretyship by the insurer to protect the public when the insurance policy to which the MCS-90 endorsement is attached otherwise provides no coverage to the insured." Distrib. Servs., Inc., 320 F.3d at 490 (citations omitted). See also Yeates, 584 F.3d at 878 (gathering federal decisions from 1st, 3d, 4th, 5th, 6th, 7th, and 9th Circuits holding that insurer's obligation under MCS-90 and federal regulatory scheme is that of a surety when other insurance coverage is lacking, not that of a provider of traditional insurance coverage, and adopting holding for 10th Circuit); Am. Alternative Ins. Co., 176 F. Supp. 2d at 557 ("[T]he MCS-90 endorsement should be construed and applied only to protect members of the public injured by interstate motor carriers from uncompensated losses – by mandating coverage where there would otherwise be no coverage. Where there is other adequate coverage, this purpose is not implicated and the MCS-90 endorsement should not operate to amend a policy. Precisely this result has been reached by a majority of the circuits that have squarely addressed this issue.") (footnotes omitted). An insurer's obligation under MCS-90 and the federal regulatory scheme is that of a surety, providing a safety net to protect the public in the event other insurance coverage is lacking,

29

and not as true insurance coverage.

These goals are achieved through an MCS-90 provision stating that the insurer agrees to pay, within the limits of liability, any final judgment recovered against the motor carrier insured for public liability and resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements "regardless of whether or not each motor vehicle is specifically described in the policy." 49 C.F.R. § 387.15, at Illustration I. Further, the insurer agrees:

> It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured.

Id.

Although the Great West Policy does not apply by its terms, there are situations in which Great West could still have liability by operation of law, based upon the federal regulatory scheme. However, that liability only arises in the event that other insurance available to Holicky is either non-existent or insufficient to meet federally-mandated minimum limits of insurance. In other

words, if no insurance coverage or other source of recovery were available, Great

West would be obligated to respond to any judgment obtained by Ann Hill

Peterson against Holicky.  Here, Ann Hill Peterson has recovered an amount in

excess of the $750,000 level of financial responsibility deemed necessary by the

Federal Motor Carrier Safety Administration for the protection of the public.  See

49 U.S.C. § 31139(b)(2); 49 C.F.R. § 387.9.  Great West's certification of its filings

only policy creates a surety obligation that is not triggered when there is $3

million in available insurance coverage, four times the federally-prescribed

minimum level of financial responsibility:

> Consequently, when an injured party obtains a negligence judgment
> against a motor carrier, an insurer's obligation under the MCS-90
> endorsement is not triggered unless (1) the underlying insurance
> policy (to which the endorsement is attached) does not provide
> liability coverage for the accident, and (2) the carrier's other
> insurance coverage is either insufficient to meet the
> federally-mandated minimums or non-existent.  Once the
> federally-mandated minimums have been satisfied, however, the
> endorsement does not apply.

Yeates, 584 F.3d at 879.  Great West's obligation under the MCS-90 and DOT

filings are not triggered here because the Great West Policy, by its terms, does not

provide coverage for the Accident since neither the tractor nor the trailer are

covered autos.  Also, the public policy purposes of the regulations have already

been met by Progressive's payment and the availability of the General Casualty Auto and Umbrella Policies. Great West's surety obligations are not implicated.

Furthermore, the DOT filings and the MCS-90 endorsement do not protect the insurer or other insurers; therefore, they do not affect the relationship among joint insurers, alter the terms of the policy for the benefits of other insurers, or control the allocation of loss among insurers. See Grinnell Mut. Reinsurance Co., v. Empire Marine Ins. Co., 722 F.2d 1400, 1404 (8th Cir. 1983) (holding that regulations do not fix liability between insureds or insurance companies); see also Distrib. Servs., Inc., 320 F.3d at 488-89 ("This appeal presents the question of first impression in our circuit: Whether . . . the MCS-90 endorsement, determines the allocation of loss among insurers. Consistent with the majority view of our sister circuits, we answer this question in the negative.") (footnotes omitted); Carolina Cas. Ins. Co. v. Underwriters Ins. Co., 569 F.2d 304, 313 (5th Cir. 1978) ("ICC policy factors are frequently determinative where protection of the public or a shipper is at stake, but those factors cannot be invoked by another insurance company which contracted to insure a specific risk and which needs no equivalent protection.") (footnote omitted).

### iii. Duty to Defend

While, in certain situations, the MCS-90 endorsement requires Great West to pay final judgments against an insured that are not otherwise covered by the policy, the endorsement does not create a duty to defend those claims. See, e.g., Harco Nat'l Ins. Co. v. Bobac Trucking, Inc., 107 F.3d 733, 735-36 (9th Cir. 1997) (holding and gathering cases holding that "federal courts have consistently stated that the MCS-90 endorsement does not create a duty to defend claims which are not covered by the policy but only by the endorsement"). See also 49 C.F.R. § 387.15, at Illustration I (providing that, as between the certifying insurer and the insured, "all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding." ). Furthermore, the endorsement grants the insurer a right of reimbursement from the motor carrier:

> The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

Id.

        iv.    **Coverage for Those Other Than the Insured Motor Carrier**

The MCS-90 and the federal regulations are intended to ensure the collectibility of judgments against the insured motor carrier only; the certifying insurer's obligations do not extend to the satisfaction of judgments against owner-operators such as Nathan Peterson.  In the regulations, the DOT defines the MCS-90 "insured" as "the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier." 49 C.F.R. § 387.5.

The Federal Motor Carrier Safety Administration has also issued regulatory guidance interpreting who is the "insured" under the regulatory scheme:

> Under 49 CFR 387.5, "insured and principal" is defined as "the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier."  Form MCS-90 and Form MCS-82 are not intended, and do not purport, to require a motor carrier's insurer or surety to satisfy a judgment against any party other than the carrier named in the endorsement or surety bond or its fiduciary.

Federal Motor Carrier Safety Administration ("FMCSA"), Regulatory Guidance for Forms Used To Establish Minimum Levels of Financial Responsibility of Motor Carriers, 70 Fed. Reg. 58065-01, 58066, 2005 WL 2438280  (Oct. 5, 2005).

The Eighth Circuit has held that, under the predecessor to the MCS-90,

without judgment of liability against the carrier, ICC regulations and filings

"may not be read into the insurance policy to impose liability upon the insurer of

the motor carrier in contravention of the precise, express terms of the policy."

Wellman v. Liberty Mut. Ins. Co., 496 F.2d 131, 139 (8th Cir. 1974).  See also

Armstrong v. U.S. Fire Ins. Co., 606 F. Supp. 2d 794, 814-26 (E.D. Tenn. 2009)

(analyzing Wellman, other federal case law, applicable regulations, and agency

guidance and holding that MCS-90 creates coverage for the liability of the motor

carrier only).

### 3.    The Reasonable Expectations Doctrine

General Casualty argues that insertion of a requirement that the Great

West Policy coverage is contingent upon lack of other available insurance, based

on defining "covered auto" based on the filings only endorsement to the

commercial auto policy issued to Holicky, is unenforceable under the reasonable

expectations doctrine set forth in Atwater Creamery Co. v. Western National

Mutual Insurance Co., 366 N.W.2d 271 (Minn. 1985).  In Atwater, the insured

bought an insurance policy that included burglary coverage.  However, when the

insured made a claim for a burglary, the insurance company denied coverage

based on a policy provision defining burglary as requiring visible marks of

physical damage at the point of entry or exit.  Id. at 274.  The Minnesota Supreme

Court concluded that, although the policy definition was unambiguous, it could

not be enforced based on the insured's reasonable expectations.  Id. at 279.  The

court noted that there is a great disparity in bargaining power between insureds

and insurance companies.  Id. at 277.  It further noted that, "no one purchasing

something called burglary insurance would expect coverage to exclude skilled

burglaries that leave no visible marks of forcible entry or exit."  Id. at 276.

Since Atwater, the Minnesota Supreme Court has refined the reasonable

expectations doctrine.  The court has explained that the doctrine should not be

expanded "beyond its current use as a tool for resolving ambiguity and for

correcting extreme situations like that in Atwater, where a party's coverage is

significantly different from what the party reasonably believes it has paid for and

where the only notice the party has of that difference is in an obscure and

unexpected provision."  Carlson v. Allstate Ins. Co., 749 N.W.2d 41, 49 (Minn.

2008).  Therefore, Atwater does not apply here where Holicky's application itself

repeats the term "filings only" countless times and provides no underwriting

information whatsoever, demonstrating that Holicky did not intend to purchase

traditional liability insurance.  Additionally, Holicky specifically signed the

Filings Only endorsement, and paid a fraction of the cost for the Great West

Policy as for the General Casualty Auto Policy – another commercial auto policy

issued the same day.

Moreover, General Casualty lacks standing to assert such a reliance–based

doctrine because it was a stranger to the transaction.  See, e.g., Malakowsky v.

Johannsen, 374 N.W.2d 816, 818 (Minn. Ct. App. 1985) (holding that stranger to

an insurance contract cannot assert estoppel to keep insurer from denying

coverage to the insured).  Holicky has not submitted any evidence to this Court

asserting its expectations regarding the Great West Policy.  General Casualty

offers no evidence that it somehow relied on Great West's actions.  The

reasonable expectations doctrine does not apply in this case.

### 4.      Doctrine of Illusory Coverage

General Casualty also argues that the Court should find coverage under

the Great West Policy based on the doctrine of illusory coverage.

> Under the doctrine of illusory coverage, [l]iability insurance
> contracts should, if possible, be construed so as not to be a delusion
> to the insured.  The illusory coverage doctrine, like reasonable
> expectations, operates to qualify the general rule that courts will
> enforce an insurance contract as written.

Jostens, Inc. v. Northfield Ins. Co., 527 N.W.2d 116, 118 (Minn. Ct. App. 1995)

(citation omitted). This doctrine "is best applied . . . where part of the premium is specifically allocated to a particular type or period of coverage and that coverage turns out to be functionally nonexistent." Id. at 119. See also H & R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co., 546 F.3d 937, 942 (8th Cir. 2008) (noting that coverage is not illusory when "insurance premium is correspondingly small") (citation omitted); United Fire & Cas. Co. v. Fidelity Title Ins. Co., 258 F.3d 714, 719 (8th Cir. 2001) ("The doctrine of illusory coverage applies only when 'part of the premium is specifically allocated to a particular type or period of coverage and that coverage turns out to be functionally nonexistent.'") (quoting Jostens, 527 N.W.2d at 119).

General Casualty asserts that, if the "covered auto" section of the Great West Policy is not interpreted to include all autos operated under Holicky's interstate authority, the Great West Policy is illusory.

The illusory coverage doctrine examines the specific allocation of the premium. Here, the Great West Policy states that the premium is zero. Additionally, Holicky has submitted no evidence to this Court regarding its expectations of the Great West Policy. Even if the Court considered the $250 fee to be a "premium," it is still a fraction of the cost of the liability portion of the

38

commercial auto policy issued by General Casualty.  Finally, Holicky did receive

a benefit from the $250 administrative fee: Great West certified its policy allowing

Holicky to maintain operating authority and continue to conduct business in and

between Minnesota and Iowa.

As noted with regard to the reasonable expectations doctrine, as a stranger

to the transaction, it is questionable whether General Casualty has standing to

assert this reliance–based doctrine.

### 5.    Contingent Coverage

General Casualty also asserts that the Court should find coverage under

the Great West Policy because Minnesota courts will not permit an insurer to

escape a statutory obligation to provide adequate insurance coverage by offering

contingent liability coverage.  See Hertz Corp. v. State Farm Mut. Ins. Co., 573

N.W.2d 686, 688-89 (Minn. 1998).  General Casualty argues that, here, the DOT

required Holicky to have certain insurance coverage in order to operate in

interstate commerce.  General Casualty asserts that Great West issued a policy

and filed a certificate with the DOT representing that an insurance policy had

been issued.  It concludes that Great West cannot now claim that its policy was

contingent on the lack of other available insurance coverage.

The <u>Hertz</u> case has no application here. In <u>Hertz</u>, the Minnesota court addressed an auto owner's obligation to provide insurance coverage under the Minnesota No-Fault Act and concluded that an owner could not fulfill that obligation through a contingent liability policy. Here, there is no allegation that Holicky violated the No-Fault Act. The General Casualty Auto Policy provides no-fault coverage.

In this case, the contingency aspect of the Great West Policy does not arise out of a contingency clause within the insurance policy or other terms within the policy. Rather, the concept of contingent coverage arises by operation of federal law and the MCS 90 Endorsement.

### E.    Priority of Coverage

#### 1.    Legal Test for Determining Priority of Coverage

Because the Court finds that the Great West Policy does not provide coverage for the Accident, the priority of coverage analysis requested by General Casualty does not affect Great West.   However, for the sake of completeness, the Court will include a priority analysis including Great West to demonstrate that, even under either permutation of Minnesota's priority of coverage analysis, the Great West Policy would still apply after the Progressive and General Casualty

40

Auto policies.

> When two policies provide coverage for the same incident, the
> question of which policy provides primary coverage is a legal
> determination that we make by looking to the language of the
> policies at issue. Minnesota courts determine the order of coverage
> by looking to the priority rules contained in each policy, generally
> found in the policies' "other insurance" provisions. If the "other
> insurance" clauses contained in the applicable policies conflict, then
> the court looks beyond the language of the policies and assigns
> primary coverage to the policy that more closely contemplated the
> risk. Where the policies equally contemplate the risk, Minnesota
> courts pro rate the loss among the applicable policies.

U.S. Fidelity & Guarantee Ins. Co. v. Commercial Union Midwest Ins. Co., 430

F.3d 929, 933 (8th Cir. 2005) (citations omitted). "Other insurance" provisions

contained in two different policies conflict if "'the apportionment among the

companies cannot be made without violating the other insurance clause of at

least one company.' " Christensen v. Milbank Ins. Co., 658 N.W.2d 580, 587

(Minn. 2003) (quotation omitted). Here, the parties agree that the "other

insurance" clauses in the three relevant policies cannot be consistently applied.

When the other insurance clauses of two applicable policies are in conflict,

courts apply the closest-to-the-risk or total policy insuring intent test to

determine which policy is primary. Garrick v. Northland Ins. Co., 469 N.W.2d

709, 712 (Minn. 1991). Under the total insuring intent test, courts determine

coverage by examining "the primary policy risks and the primary function of

each policy." Id. (citation omitted). Under the closest-to-the-risk test, courts ask

> (1) Which policy specifically described the accident-causing instrumentality?

> (2) Which premium is reflective of the greater contemplated exposure?

> (3) Does one policy contemplate the risk and use of the accident-causing instrumentality with greater specificity than the other policy that is, is coverage of the risk primary in one policy and incidental to the other?

Auto Owners Ins. Co. v. Northstar Mut. Ins. Co., 281 N.W.2d 700, 704 (Minn.

1979); Redeemer Covenant Church of Brooklyn Park v. Church Mut. Ins. Co., 567

N.W.2d 71, 80-81 (Minn. Ct. App. 1997). Additionally, courts may first ask which

insurer "by its policy, intended to cover 'business operations.'" U.S. Fire Ins. Co.

v. Fireman's Fund Ins. Co., 461 N.W.2d 230, 234 (Minn. Ct. App. 1990) (citation

omitted).

### 2. Total Policy Insuring Intent Test

Great West argues that the Court should rely upon the total policy insuring

intent test. The Court determines "the total policy insuring intent, as determined

by the primary policy risks upon which each policy's premiums were based and

as determined by the primary function of each policy." <u>Integrity Mut. Ins. Co. v. State Auto. & Cas. Underwriters Ins. Co.</u>, 239 N.W.2d 445, 446 (Minn. 1976).

Under the total policy insuring intent test, based upon the size of the premiums and the scheduled covered vehicles, the Progressive Policy is primary; the General Casualty Auto Policy is secondary; and, if it applied, the Great West Policy would be tertiary.

As to Progressive, Nathan Peterson purchased the policy to comply with his obligations under the Independent Contractor Agreement with Holicky, including obligations to insure his tractor, to hold Holicky harmless with respect to any liability in connection with the operation of the tractor while pulling Holicky's trailers, and to indemnify Holicky for any such loss. <u>See</u> <u>Sathre v. Brewer</u>, 184 N.W.2d 668, 671 (Minn. 1971) (describing truck lease agreement as a "significant insurable circumstance" in prioritizing coverage). Additionally, the policy explicitly was based upon the risk of an accident occurring while Peterson was driving his tractor with Holicky's trailer, hauling for Holicky: the policy was bought specifically for Peterson's tractor, and an additional premium was paid for liability coverage for non-owned trailers; and Holicky was explicitly named as an additional insured for its liability arising from Nathan Peterson's conduct.

Finally, when the liability premiums paid for the tractor and trailers are added, the Progressive Policy collected the highest premiums.

As to General Casualty, based on the size of its premium, its commercial nature, its specific listing of the trailer at issue, its provision of such state-mandated coverage as UI/UIM coverage, and its insured - Holicky - the General Casualty Auto Policy was also created to insure Holicky and permissive users of its trailers and tractors doing its commercial hauling, which is the context in which this Accident occurred. It applies on a secondary basis.

Great West would be tertiary because there was no premium; the administrative fee was small; neither the trailer nor the tractor involved in the Accident were listed; and the Great West Policy filings only designation demonstrates that the policy was intended to act as a surety to benefit the public. Although the Great West filing was a prerequisite under federal law for the tractor-trailer combination being in interstate commerce on the day of the Accident, it is also true that General Casualty's UM/UIM coverage, was a prerequisite under Minnesota law for the tractor-trailer combination operating in Minnesota on the day of the Accident. Therefore, the argument that Holicky would not have been in operation on the day of the Accident "but for" a

particular policy does not weigh in favor of priority of Great West or General

Casualty.

### 3.     Closest to the Risk Test

General Casualty asserts that the Court should apply the closest to the risk

test to determine priority.  The Court concludes that the result is the same under

this four-part test.

### a.     First Factor: Which Company by Its Policy Intended to Cover 'Business Operations'?

This factor is neutral as to all three relevant policies because all three

policies are commercial policies.

### b.     Second Factor: Which Company Specifically Described the Accident-Involved Vehicle in its Policy?

This factor looks at which insurers specifically described the accident-

involved vehicle in their policies.  Auto-Owners, 281 N.W.2d at 704.  In an

accident involving a tractor-trailer combination, such as this case, the involved

trailer is relevant.  See Nat'l Indemnity Co. of Minn. v. Ness, 457 N.W.2d 755, 759

(Minn. Ct. App. 1990) ("Under the facts of this case, any attempt to separate

damages caused by the tractor from those caused by the trailer would be futile.

The trailer was dependent on a tractor for movement.  The two must be viewed

as a unit.") (citation omitted); see also Northland v. W. Nat'l Mut. Ins. Co., No. C5-92-324, 1992 WL 153094, at *2 (Minn. Ct. App. July 7, 1992) (rejecting General Casualty's argument that Ness should be reversed and holding, in its closest to the risk analysis, that "there is a unitary risk involved in driving a tractor-trailer different from the risk involved when a tractor is driven without a trailer because, when driven in tandem, it presents such a myriad of physical effects, one on another, as to defy analysis").

Here, this factor weighs in favor of primary coverage by Progressive, as its policy explicitly is based on the tractor at issue and included a separate premium for non-owned trailers. This factor weighs in favor of secondary coverage by General Casualty, as its policy explicitly lists the involved trailer. This factor weighs in favor of tertiary coverage by Great West, because its policy did not provide coverage for any specifically named vehicles at all, let alone those involved in the Accident.

> ### c. Third Factor: Which Premium Is Reflective of the Greater Contemplated Exposure?

In this case, unlike in the U.S. Fire case relied upon by General Casualty, the Court has detailed information on how the various premiums were allocated.

Cf. U.S. Fire, 461 N.W.2d at 235 ("Without additional [premium] information, the third factor is of little help in determining which carrier should be primarily responsible . . ."). Here, all three policies list the same $1 million liability limit. Progressive charged a $3,497.00 liability premium for the tractor and an additional liability premium of $798.00 for non-owned attached trailer liability coverage. In total, including other coverage, such as UM/UIM coverage, the premium for the Progressive policy was $5,554.

Holicky paid $3,941.00 in liability premiums for the General Casualty Auto Policy, which covered multiple tractors and trailers, including the trailer involved in the accident. Overall, including premiums for PIP, UM/UIM, physical damage, etc., Holicky paid $7,810.00 in premiums for the policy.

The Great West Policy lists a premium of $0. Holicky paid $250 administrative fee for the liability portion of the Great West Policy.

For this factor, the larger the premium, the larger the contemplated exposure. See Goeman v. Allstate Ins. Co., 725 N.W.2d 375, 379 (Minn. Ct. App. 2006) (analyzing second factor by examining whether any insurer "contemplated greater exposure by an increased premium"); CPT Corp. v. St. Paul Fire & Marine Ins. Co., 515 N.W.2d 747, 751 (Minn. Ct. App. 1994) ("Aetna's "Fiduciary

Responsibility" premium was $3,776 whereas St. Paul's "Administration Liability" premium was only $339. The difference between the premiums indicates that St. Paul's policy covers the losses only incidentally, if at all.").

This factor weighs in favor of Progressive as primary, because Progressive accepted $3,497 in liability premiums to insure just the 1997 Freightliner and then also accepted an additional $798 to insure any non-owned attached trailers. The Accident involved both the Freightliner and the trailer. This factor weighs in favor of General Casualty being secondary because it charged $3,941 for liability coverage with the specific trailer at issue being a basis for part of the premium computation, along with a number of other tractors and trailers. Finally, this factor weighs in favor of Great West as tertiary, because Great West only charged a $250 administrative fee in exchange for certification on behalf of Holicky, and none of that $250 was allocated to a named vehicle.

>    **d.      Fourth Factor: Which Company Insured the Particular Risk as an 'Incident' of Its Object, and which Policy Appears to Cover the Particular Car and the Risks Inherent in Using the Car for Contemplated 'Business Operations' Uses?**

This fourth factor does not definitively weigh in favor of one policy over another. All three policies are commercial auto policies. All three named

Holicky as an insured and intended to cover its business operations. Progressive more specifically named and contemplated Nathan Peterson using his tractor with Holicky's trailer while hauling for Holicky. General Casualty did not name Nathan Peterson; however, it did provide the state-mandated coverage necessary for Holicky to do trucking business in Minnesota, such as PIP and UM/UIM coverage. The Great West Policy did not specifically name the trailer or the tractor involved, but it provided the DOT filings necessary for Holicky to engage in interstate trucking, which was precisely what was occurring when the accident happened. Both the Great West Policy and the General Casualty Auto Policy were necessary for Holicky's operation on the day of the Accident.

### e. Synthesis of the Factors and the <u>U.S. Fire</u> Case

Based on the Court's analysis and weighing of the above four factors, if the Great West Policy were to provide coverage, that coverage would be tertiary. The Progressive Policy would be primary, and the General Casualty Auto Policy would be secondary.

General Casualty relies heavily upon the <u>U.S. Fire</u> case to argue that, under the closest to the risk test, the Great West Policy should be primary. The Court has carefully applied the closest to the risk factors to determine that, if Great

West provides coverage at all, such coverage would be tertiary.  The Court

concludes that the U.S. Fire case does not dictate a different result.

In U.S. Fire, the Minnesota Court of Appeals did find the federal filings by

the trucking company's insurer to be important in determining the closest to the

risk analysis.  However, it reached that conclusion because it held that the ICC

filings and the Minnesota No-Fault Act and state regulations dictated that the

trucking company, "U.S. Salt[,] be treated as the owner of the vehicles, and,

therefore, that the insurer of its business operations was primarily obligated to

insure the loss."  U.S. Fire, 461 N.W.2d at 232-33.  In other words, the import of

the ICC filings, in combination with Minnesota law, was that U.S. Salt should be

treated as the "owner" of the involved vehicles.  Then, the owner's insurer

should be primary.  Under this reasoning, without examining the other relevant

factors, one might conclude that Progressive was tertiary to Great West and

General Casualty, which both insured Holicky's trucking operations.  However,

this reasoning has no implication as between Great West and General Casualty –

both were insurers for Holicky, the trucking company.  In fact, many of Holicky's

*Minnesota* statutory requirements were satisfied by the General Casualty Auto

Policy, not by the Great West Policy.  When the closest to the risk analysis is

applied as between Great West and General Casualty, General Casualty is primary.

Moreover, other relevant factors of the closest to the risk test were not at issue in U.S. Fire.  For example, the U.S. Fire court held that the third factor – which premium reflected a greater contemplated exposure – was neutral because the court did not have sufficient information to analyze the various premiums. In this case, the Court does have information on the premiums and, under any variety of mathematical calculation, it is clear that the $250 payment to Great West reflects less exposure than the thousands of dollars in liability payments for the specific vehicles involved in the Accident that were paid to Progressive and General Casualty.

**F.      Remaining Claims**

The Court will not enter judgment in this case at this time, as requested by Great West, because some of Holicky's claims, such as its indemnity claim, have not been addressed in the pending motions and, therefore, remain unresolved.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.      Plaintiff Great West Casualty Company's Motion for Summary

Judgement [Docket No. 26] is **GRANTED**.

2.      Defendant General Casualty Company of Wisconsin's Motion for
        Summary Judgment [Docket No. 33] is **DENIED**.

3.      Plaintiff Great West Casualty Company's filings only policy of
        insurance does not, by its terms, provide coverage for the claims
        made against Defendants Holicky Bros., Inc. and Nathan Peterson in
        the case of <u>Ann Hill v. Nathan Peterson and Holicky Bros., Inc.</u>,
        venued in Carleton County, Minnesota District Court and arising
        out of a June 30, 2005 motor vehicle accident.

4.      The  purpose of the Federal Motor Carrier Safety Regulations'
        requirement that Holicky Bros. obtain liability insurance,
        guaranteeing its financial responsibility for liability to members of
        the public injured by its interstate operations up to the amount
        prescribed by 49 C.F.R. §387.9(1), has been satisfied by payments and
        settlement by Progressive Classic Insurance Company, and through
        the insurance coverage afforded to Holicky Bros. through the
        policies issued by Defendant General Casualty Company of
        Wisconsin.

5.      Plaintiff Great West Casualty Company is not obligated by operation
        of law, or by virtue of the BMC 91X filing it made on behalf of
        Holicky Bros., Inc. with the United States Department of
        Transportation, to defend Holicky Bros. or Nathan Peterson, to
        satisfy any judgment against Holicky Bros. or Nathan Peterson that
        may be obtained by Ann Hill Peterson, or otherwise provide liability
        coverage for the claims of Ann Hill Peterson arising out of the June
        30, 2005 motor vehicle accident.

Dated:   August 16, 2010                      <u>s/ Michael J. Davis</u>
                                              Michael J. Davis
                                              Chief Judge
                                              United States District Court